Good morning, your honor. Thank you. May it please the court. I'm Aaron Harrigan, and I am counsel for appellant Kenneth Spirito. Mr. Spirito had several different counts of conviction that stemmed from the charges of federal program fraud, and money laundering. And the government has a central problem with those particular sets of convictions. And that is this Kenneth Spirito at all times there and there was no conflict in this evidence that was presented by the government was an employee serving at the pleasure of the members of the Peninsula Airport Commission. He was not responsible for checking the legal advice of counsel. He was acting only under authority that was delegated to him. And when he did move the funds in order to satisfy what were contractual obligations entered into by the Peninsula Airport Commission, with town bank, every time he moved those funds, that was done with the knowledge of the Peninsula Airport Commission. It was done with the approval of the commission in in meetings that were public and that were voted upon and actions that were approved. And at all times, those funds remained in the control of the Peninsula Airport Commission. And under those that particular set of facts, particularly in light of Kenneth Spirito to have intentionally misapplied funds. The direction of those funds was the exercise of regulatory power, and only regulatory power that the Peninsula Airport Commission had and was entitled to to exercise. There was no dispute in the evidence that the Peninsula Airport Commission would in fact enter into a loan guarantee. There was no dispute in the evidence that the Peninsula Airport Commission could in fact obligate its funds and direct every single dollar that it had within its budget. And there was no dispute in the evidence that all of that obligated funds that issue in this case, all of those funds were for an airport purpose. And it was for air service development. There was no dispute that all of these were discussed by members of the Peninsula Airport Commission, that they will discuss with counsel for the commission, that the loan guarantee was actually signed by the chairperson of the Finch, that Mr. Spirito was not even in the room at the time that these documents were excluded, that Mr. Spirito's allocation of those funds was something presented to the commission. Commissioner James Borey testified about the presentation that was made about the sources of funds that were going to be that they had checked on the source of funds and that that had been obligated and that guaranteeing this loan was not going to be a violation of the law, state or federal or a violation of any state or federal policy. And at a fundamental level, and I think that this is really key when we're thinking of the Supreme Court's unanimous opinion in Kelly, and how it applies to this case, it's very difficult to look at the very complex layers of regulations, both at the state and federal level, the different policy manuals, the different areas of restriction for these funds. There's no dispute that the airport commission could have used funds to support the development of air service. The government's allegation is that there's a policy manual or a specific restriction in regulations or some sort of federal policy that says this particular bucket of funds wasn't allowed to be used for this particular purpose. And they're predicating their entire theory of criminal liability on those violations. And that simply was not contemplated by Congress. When they enacted the federal program fraud statute, the jury cannot be expected to unpack those layers of regulatory provisions and policy manual applications, something that that experts within the industry on the stand in front of the jury intended when they enacted that statute and contemplated criminal liability for government officials who were making these kinds of decisions. And the government makes an argument and sets forth a case that it simply must be able to redress these wrongs. And if this court takes the Supreme Court's holding in Kelly, and applies it to the facts of this case, that they're suddenly going to be unable to move forward on a prosecution theory of intentional misapplication. And that's simply not correct, because there are scenarios where intentional misapplication is an appropriate theory for prosecution under federal program fraud. So for instance, a prosecution in North Carolina, involving a government official operating in a similar regional economic development authority recently pled guilty under a theory of intentional misapplication, but the facts were fundamentally different. In that case, Ellen Frost was was actually had not gotten any authorization had not sought authority, she knew that she was supposed to get authorization for obligating this $500,000 worth of funds, and she didn't do it. And that's the kind of intentional misapplication. There was agreement in that case, that that action did, in fact, benefit the tourism for that area, which was her charge and her mandate. So there was no there was no dispute that the victim had gained and profited from her actions. But there was also no dispute that she had taken those actions and obligated those funds without authority. That is the kind of intentional misapplication that the law that you take Kelly and review the evidence here and properly apply it to this case. This is simply not the type of case that is contemplated for federal program fraud. Counsel? Yes, Your Honor. You talk very, very fast. It's hard to get a word in. Can you point to any place any evidence in the record demonstrating that the Peninsula Board gave specific authorization to place the specific funds used in these restricted accounts as collateral? Your Honor, the Peninsula Airport Commission, and I think that the most important place to look for that evidence is from the testimony of James Borey was a member of the commission that testified specifically about the presentation of the funds to the Airport Commission in the meetings that were that were held. And they did go into closed session. So I cannot point you to two minutes, specifically, Your Honor. But if you would give me just a second, I can point to the point in the transcript where Mr. Borey testified about the presentation about the specific uses of the funds and the council opinion about that. And actually, Your Honor, there is Mr. Borey's testimony is in joint appendix 1553 to 54, where Mr. Borey discussed that there was an affirmative opinion in a Peninsula Airport Commission meeting that using the state entitlement funds to guarantee the loan was permissible under state regulations. So that's really from... Thank you. I appreciate. Thank you for clarifying the question for me. The Peninsula Airport Commission's action was to grant authority actually to LaDonna Finch. LaDonna Finch was the chair of the commission. So there was no resolution that came out of the Peninsula Airport Commission that did the chairman then delegate this authority to your client? Yes. And where's the evidence of that? Your Honor, I think if you look at, again, the testimony, Mr. Borey became the chair shortly after this was executed. He became... I thought you were telling me some woman was, LaDonna Finch or something. And I still haven't heard that part of the record. Now, maybe there isn't any. So, Your Honor, it's a delegation of authority that was taken. And if you... I cannot point you to anything that was a written resolution that was passed. So all of these actions were simply discussed orally at the meetings. That's the evidence in the appendix. So there's no... Let me try this a different way. The first 10 minutes of your argument, maybe 15 minutes, were all about that this is not his responsibility. This is the corporation's responsibility. And they made all these decisions. And there seemed to me to be a fair amount of evidence that he was acting without their authority. So what I'm trying to do is to say, what do you rely on to say that? To make your argument. Yes, Your Honor. And those would be the citations to Mr. Borey's testimony. So there was a change in chair. Mr. Borey took over as the chairperson of the Peninsula Airport Commission shortly after the loan guarantee was executed by the prior chair, LaDonna Finch. So I'm not trying to make anything more complicated, Your Honor. But there were two different chairs who testified, both of them testified at trial, to their awareness and their knowledge about the loan guarantee, and the purpose of the funds and where the funds were going to be allocated. Okay, let me put this still another way. And then I will stop. There was a civil trial, right? There were... Did you get to the to the commission? Or yes, Your Honor. And that was not on the same grounds that is at issue in the criminal trial. Well, I know it's not the same case. But it seems to me that these very arguments were made and rejected. That is, you, the commission gave me all this authority. Well, Your Honor, the civil proceeding, and this was not introduced at trial, which is one of the errors. The civil suit was Mr. Spirito, and he was successful in obtaining a settlement. He was successful. And that was on defamation. It was not on the same issue. That was never introduced at trial. But the civil deposition was not some civil suit that my client lost. He was successful, and it was defamation. That never came in at trial. And that was not on the purgatory. That the government's evidence failed to prove materiality. That his statements on some ancillary topic matter that were did not go to the heart of defamation kind of underscores the lack of evidence about materiality that was necessary. But didn't that didn't come the defamation litigation didn't come in at trial because you, your side objected to it, right? That's true, Your Honor. So there were some pieces that were objected to, but the government operated under a fundamental misunderstanding of the relevancy. And you can see it in the questioning and in the government's arguments. The government pointed to statements that Mr. Spirito made in that deposition and talked about the relevance to the criminal target, not about the relevance to the civil matter, which was in fact defamation. And so he's trying to point to the defense objected to specific pieces of evidence that it objected to coming in at trial. And those were properly excluded, were deemed to be inadmissible. And so the defense position is that the government must prove guilt based on properly admitted evidence. And so if the government cannot sustain its burden on properly admitted evidence, then the conditions have to be reversed. And and those charges have to be dismissed. Your Honor, I see that. I just want to just follow up on Judge Mott's question, because I'm not sure you answered it specifically. But the question is this. What evidence is it that anyone, chair or succeeding chairs, authorized the placement of the funds in the 12 counts that became restricted and under the control of Towne Bank? Your Honor, if you look at the testimony of Mr. Borey, and the and those are the joint appendix sites. Now don't tell me that whether he had knowledge of something going on. I'm talking about authorization. You said you were talking about knowledge that something was happening. I'm talking about authorization. Is there evidence that they were authorized? Because transfer of $5 million is a lot of money. Who did they sign off on it? Or is there anything in the record that says you can put this $5 million in these 12 accounts? Where is that? Your Honor, the authorization for the loan guarantee, what? Wait, the loan guarantee, it said, I know the first term, he said, last name Donna. She was given sort of broad ability to enter in something in terms of a town bank as a guarantor, correct? Yes, Your Honor. But did she ever authorize the transfer of funds to those accounts or anybody else as a chair or as a member of the board? Yes, they did. And where is that? Where is that in the record that they authorize? Not knowledge, knew about it, authorized it. It's $5 million for the company. That's a whole lot of money. So someone signed off on it? Or say, you can deposit this money in this fund? Where is that? Just just give me the record. Just tell me where it is. Yes, Your Honor, I will point you to the record so that it will be it's a trial exhibit, Your Honor. And the trial exhibit, which has signatory authority on every single bank account that's shared with Mr. Spirito and every member of the commission. And those documents and the loan documents specifically noting the three different accounts and sources of the funds were introduced as an exhibit at trial. And Your Honor, if I can... And who signed that transfer? Every member of the commission was provided signatory authority on those funds transfer and funding those accounts. Your Honor, if I... You know, signatory authority is different than who actually signed for it. That's like 10 people have the right to sign it. I want to know which one of the 10 signed it. LaDonna Fitch, Your Honor. She signed the transfer of funds. LaDonna Fitch signed the $5 million loan guarantee. All of them signed on the actual accounts that were funded. So the commercial signature cards were government exhibit A5, supplemental appendix page 34. You can see each of them independently signed. And it's to fund the new account numbers. It is the Peninsula Airport Commission and the title of the account is the U.S. Department of Transportation small community air service grant. So the name of the account, the date it was opened, and all of the members of the commission signed independently along with Mr. Spirito and Renee Ford and LaDonna Fitch and it was all signed on the date that the action was voted on by the commission. Those three separate accounts have similar signature authority. And then, Your Honor, at government's exhibit H33, which was introduced at trial, that is where Mr. Spirito was directed by the chair of the commission and by counsel for the commission to make the direction for Mr. Spirito to move that money from that account to the penitentiary account for the loan guarantee. Thank you. So, counsel, the government is not yet to tell us what they think. And I just want you to be sure that you stand by this and there isn't something that you can, that you will say, Oh, well, the government doesn't, blah, blah, blah. This is the full story. This is all you have, all you've told us, right? Your Honor, I rely on this issue. Your Honor, I'm relying on our briefs. I don't want to, I don't want to say that on, but on this issue, in terms of signature authority, absolutely. Your Honor, I can point to those documents and those signatures executed by each member of the airport commission on each of the accounts. No, I, you don't have to repeat that. All you're doing is using extra time and going into your rebuttal. So you've said the same thing. And I mean, the government won't say, well, they didn't know what this was about or that there is signature authority, but that doesn't do what you're saying it does. So I'm trying to give you a little chance to do a preemptive strike. But if you don't want one, if you're just going to repeat the same argument, fine. Okay. Your Honor, I appreciate that. And I say that if you look at the testimony of LaDonna Finch and James Borey, about what they knew about the actions they were taking that coincided with the date, they made those signatures on those accounts that will provide all of those answers. And I've cited to those key pieces. Thank you. Thank you, Your Honor. Thank you, Ms. Harrigan. Mr. Samuels. Thank you, Your Honor. May it please the court, Brian Samuels for the United States. I'm an assistant United States attorney in the Eastern District of Virginia. As determined by the jury in the district court that sat through the extensive trial in this matter, substantial evidence did exist to support the jury's verdicts on 22 counts of conviction at issue that related to the defendants, not the Peninsula Airport Commission's, not any of its employees, not a lawyer's, the defendants intentional and unauthorized use and loss of public funds, publicly regulated funds belonging to the commission and the custody of the commission for a private entity. Now, to call this an airline would be somewhat charitable. Ms. Samuels, I think we understand what the businesses did. But what I'm talking about is this. Everybody knows when there is, you know, failure, you know, success, you know, as many parents, but failure is an orphan. So what we're talking about is this. We know that 5 million lost because people's default and they lost. Can you just focus on this? Their defense is that he was the CEO. He was trying to save this airport's operation. Yes, it turned out not to be a wise choice to try to, you know, to get people's own board. But being wrong at business and didn't have the authority to transfer those funds on behalf of the airport commission for the purpose of guaranteeing or basically giving security. This is more than just guarantee. This was basically cash security. God may not alone. What is the evidence that he didn't have authority? Because that's your burden. He doesn't have to prove he is the CEO. And so he comes with all of that imprimatur with all the rights and privileges to retain there, too. So tell me why he didn't have the right to do that. What is the evidence? Not what the jury could have. What is the evidence that he didn't have authority? I understand, Your Honor. And this gets into the distinction between doing a loan guarantee where there was some visibility on a loan guarantee and the specific transactions that were charged in the superseding indictment. These are counts one through 11 misapplication counts. And one of the cleanest pieces of evidence I can point the court to is government's exhibit B-17, which was a handwritten list of notes that the defendant and his finance director, Rene Carr, sat down and determined how these restricted collateral accounts were going to be funded. It was just the two of them doing that. Rene Carr, who was the finance director, knew that the money that court revenue could not be used for a loan guarantee, knew that passenger facilities charges could not be used for a loan guarantee. But it was the two of them sitting down, no members of the commission present, no other employees present, no lawyer present, deciding how to fund these accounts. And I'll point out to the court that the decision to structure these collateral accounts in their names was done on June 5th of 2014. This special meeting that happened later that resulted in this very vague resolution didn't happen until four days later on June 9th. And the record showed that the defendant essentially manipulated the commission into signing off on this guarantee. But there were a number of members of the commission that did not understand that there was actually going to be cash collateral that was going to be put into these accounts. Stephen Mallon, one of the commissioners, testified about that. LaDonna Finch was not sure how it was going to be funded. George Wallace, another commissioner, he wasn't sure how it was going to be funded. Jim Borey was a commissioner. He had some idea, but he was relying on the defendant as the airport director. Each one of these commissioners served for a couple hours a month. They made about $200 a month. The evidence of trials showed that they relied heavily on the executive director. And what our evidence showed is that this plan was put in motion before the commission ever voted on it. There was an exhibit, I think it was D5, where people expressed voted to accept a loan guarantee from TowneBank guaranteed by the Peninsula Airport Commission. This was done in May of 2014, a full month before this was ever formally presented to the commission. And there was a number of emails that showed that the defendant was the architect of putting this plan in motion. There was evidence from the loan guarantee point, which, again, some other people did have knowledge that there was going to be a loan guarantee, including these lawyers. And there was a reliance of counsel instruction asked for by the defendant, tendered by the court. The jury was given the opportunity to determine whether the defendant really relied on counsel. But there was further evidence that there was no opinion on the use of any of these funds. The defendant determined the airport revenue, which can never go outside the airport. And that's really the universal restrictions on all these funds. 666 is designed to protect the integrity of entities that receive vast amounts of public funding. In this case, Mr. Samuels, Mr. Samuels, opposing counsel gave a list of J.A. sites and authorized the transfer of these funds. What's your response to that? Yes, Your Honor. Those exhibits that counsel cited are merely the signature cards for the accounts. Those signature cards and the signing off on those signature cards have nothing to do with the transfers that are actually being done into those accounts. The correct. Correct, Your Honor. That's correct, Your Honor. The there is no indication, um, that anybody other than appellant authorized the transfer of these funds are signed off on the transfer of these funds. Yes, Your Honor. That was the testimony of the defendant that he recommended which funds to be used to fund the loan guarantee. Again, I want to be clear that I'm drawing the distinction between the loan guarantee as an idea and the particular buckets of prohibited funds that were used to put into these restricted accounts and were used as collateral and provided to town bank. It was just the defendant and his finance director, Rene Carr. B-17 is the handwritten list as to how these funds were used. I'm just drawing the distinction between he got authorization to get loans and then he just explained to me what your two categories are because we're trying to reconcile what your colleagues said and what you're saying now. Yes, Judge. The first category is doing the loan guarantee in and of itself. And that's something that the board agreed to. In broad form, without possibly understanding everything? Yes. Yes, Your Honor. Yes. The category that I'm focusing on that only the defendant had control over was how that loan guarantee was going to be funded and not even every member of the commission understood that there were going to be these collateral accounts. These collateral accounts again were set up on June 5th before the commission ever voted for this resolution to allow LaDonna Finch to enter into these agreements. And it was the defendant acting again with Rene Carr, who was a government witness, did testify that she sat down with the defendant. No other members of the commission were present. She knew this was wrong. She did it because of her relationship with the defendant and he was her boss. And those are the specific misapplication charges, the specific financial transfers that only the defendant and Rene Carr were involved in actually doing and moving those prohibited funds over into these accounts that were restricted, that TowneBank had a security interest on, and that if and is what happened, the loan defaulted. All that money was swept over and paid for the loan guarantee. Your Honor, I would like to address some of the points that the council makes about the Kelly case, and I've certainly reviewed that case. And what I would say to the court is Kelly really goes to the issue of the government acting as a regulator when it is choosing among different public uses of funds. That's what happened in Kelly with these bridge closures and these bridge realignments. The defendants were choosing which group of drivers would have access to the lanes. There was no risk of the bridge as property, and it was not going to a private prohibited use. That's very different than what we have in this case, where you have actual funds, $5 million in different groups of funds. You had some funds that were state entitlement funds, some funds, airport revenue, passenger facilities charges, raise funds from this separate group, all of which were outlined in the indictment. The jury can make determinations that those were the funds at issue, even though the defendant denied that he ever did anything with airport revenue or passenger facilities charges. But those were the funds that were actually moved over into these collateral accounts and are going for the benefit of a private entity, TowneBank and People Express Airlines, and that's very different than what you had in Kelly when those bridge lanes, they couldn't be commandeered, they couldn't be put at risk. In this case, these funds were put at risk, and interest was given over to TowneBank for the benefit of the commission. The other point I would make about Kelly is that the determination seemed to be there that this was choosing between different public uses, and the defendant made a point that this was for an airport use, and I would dispute that, Your Honor, and the record would support that. Using airport funds for an off-the-airport use is prohibited and restricted. We spent a lot of time in the trial showing the evolution of People Express, how it made so many efforts to get money, and it was a two-year period of time where they were trying to get this money. The defendant never came forward and said, let's give airport money directly to People Express. He certainly knew that giving airport money directly to People Express would be a real problem, so he tried to do this indirectly by having the – and even the representatives from TowneBank, when they testified, they looked at People Express, they said, this is not bankable. It has no record of success. Why don't we just give the money to the Peninsula Airport Commission and have the airport commission give it to the airport? But the defendant did not want to do that. He knew that he had to conceal this transaction beyond this different loan guarantee. And then as further proof of this, Your Honor, the defendant lied about it. He lied about it to state regulators. He subsequently lied about it to federal regulators. He lied about it in the course of a civil deposition, and he lied about it when he testified on the stand. Again and again, he acted to conceal his conduct. And so in the government's view, this is not a situation where we have any kind of regulatory interest. We've got the Peninsula Airport Commission acting as a property holder, and it gives up its property to TowneBank so that this loan can be guaranteed, going to the benefit of a private entity that was prohibited. The defendant knew it was prohibited, and he acted to conceal it at the front end and then lie about it on the back end when it did come to light. And if I can, if the court has any other questions about the loan guarantee, I'm happy to answer those or on Kelly. Otherwise, I'll pivot over to the perjury counts because I know the defendant had raised those. Can I ask you one question about restitution? Yes, Your Honor. I'm really, really sort of surprised we didn't hear anything about it from the other side. The government does not, it files for restitution, but it does not argue that. That's not part of the sentence, sentencing argument, is it? I'm sorry, Your Honor. There was both forfeiture in this case, and there was also restitution. I'm sorry, forfeiture, I'm talking about. You're absolutely right. Thank you, Your Honor. Yes, we had filed for a preliminary order of forfeiture. Which is required. I mean, there's nothing, that's the proper procedure, right? Yes, Your Honor. And we had that preliminary order of forfeiture entered by the court about five days later. That was in advance of the sentencing, and there was no issue raised as to the forfeiture at the sentencing. There was no issue raised by the defendant or by defense counsel. Candidly, Judge, we did have our forfeiture attorney there. We were told it was not an issue, and so it just didn't develop further. What do you mean you were told it was not? Did the other side tell you it was an issue, or the district court, or you just concluded it wasn't an issue? No, Judge, we had our forfeiture attorney there, and this is not in the record, of course, but just to tell the court, and it wasn't Ms. Harrigan, it was defendant's trial counsel that told our forfeiture attorney that the forfeiture would not be an issue at the sentencing. And so we did not deal with that or address that further, and it didn't come up until further down the lane when some of the defendant's assets were seized. And so there was also, as the court mentioned, there was a restitution judgment in the amount of $2.5 million, again, going to the loss that was sustained by the airport commission based on the defendant's misapplication. Okay. I sidetracked you. Go ahead with your argument. No, that's all right. If I could touch on the perjury, because I know the defendant had raised that, and this was a situation where we had played the clips of the defendant's statements at his deposition, and it wasn't an isolated area. It was probably 27 different exchanges or questions and answers going through about 17 different exchanges that all dealt with whether the defendant diverted airport revenue or whether the commission had authorized the defendant to do this. That was one of the areas that does overlap with the 666 charges. It's count 21, where the defendant is basically saying that he was directed to do all this by the airport commission. The jury found that to be false and perjurous and not correct, based on the evidence of the trial, that it was the defendant that was actually manipulating this and running this. We did ask the agent that introduced the perjury clips whether the questions and answers in the deposition were part of the issues in the civil suit. An objection was raised, and we didn't go further with that. But there was other evidence where the defendant, in his encounters with law enforcement, linked his civil case with the inquiry that the agents had over people expressed over the airport loan. And when the defendant actually sent his deposition to the agents, this formed the basis for count 24, an obstruction of justice charge, where the defendant was convicted at trial, but it was overturned on a rule 29 because of an Aguilar nexus problem. But the defendant, in sending that deposition to the agent, made the connection that there's more than enough in here. The state or the council was very thorough when I was interrogated. I consider this a closed matter, as did the airport commission and the judge that ruled on this in earlier in 2019. So the defendant was making all these connections between the subject of his deposition and the subject of his case and the question of the loan guarantee and people's express, which were the very questions that the agents were there to ask. So there was certainly enough information for the jury to conclude that information and questions about people express, questions about the loan guarantee were proper subjects of inquiry at the deposition and certainly could have affected the defendant's civil case when he is suing his employer related to his termination. So I would point the court out to that. If the court has any further questions of me, I'm happy to address them. Otherwise, the government would stand on its brief. All right. Thank you, Mr Samuels. Thank you, Judge Miss Harrigan. You have some time reserved. Thank you, Your Honors. First, I want to address Judge Moxie's question about the forfeiture and we are moving forward. We understand it is a plain error analysis, but there were a couple of key pieces of information there that I did want to point out. The day of the defendant's sentencing was July 15, 2020. That was 14 days after Mr. Samuels and the government had filed their preliminary notice of forfeiture. And that would have been the time in which the defendant would have been able to object. And the federal rules of criminal procedure require actual notice to the defendant and constructive notice, which seems to be the theory on which the government is relying, is simply not enough. There is a reason for the need for actual notice, and that's because it gives the defendant an opportunity to raise important issues so that those issues can't be waived. So he understands all of the penalties to which he is being subjected as part of the sentencing proceeding. And if constructive notice were enough, then plea hearings would simply be shorter, and they are not. And so we do think that the defendant required actual notice. The judgment should have noted the forfeiture as part of it. So not just during the sentencing hearing, but the judgment itself should have noted that. Neither of those requirements was met, and they are not superfluous requirements. There are real reasons for that notice to be given, because in this case, there is a compelling argument. We think that this would have violated the imposition of this particular volume of fine would have been excessive and would violate the 8th Amendment, given particularly the government, the judge's comments during the sentencing about his view of the defendant's conduct. That there was no theft, that there was no bribery, that there was no kickback, and that he believed that the defendant acted with good intentions in pursuing this endeavor on behalf of the Peninsula Airport Commission. On the on your argument is that you had no notice of this. Is that correct? I'm arguing that the defendant subjectively needed notice of this, and what does that mean that somebody has to knock at his door and tell him? I mean, I'm not sure what you mean. Usually, when we file something in court that gives somebody notice of something. Your Honor, it is required to be part of the things he is notified. He is being subjected to as part of his sentence, his criminal sentence. And so all of the things that are required in a sentencing hearing that that colloquy that the judge engages indirectly with the defendant is important and it's critical. And it's a key step of the process that we have enshrined in our system that he has actual notice in a direct colloquy with the trial judge, all of the different implications of this sentence. So did you file a motion to reconsider with the District Court? I did not, Your Honor. I was not trial counsel, but trial counsel did file that in August of 2020, and that was denied. And that's in the record somewhere. That is in the record, Your Honor. Your Honor, I do want to hit, I understand there were multiple counts. There are very different theories. I do want to, I'm going to rely on my brief and my reply for some of the things I may not be able to talk as fulsomely about here. But I do want to point to the limiting instruction, the denial of that, which we think is very key. Because what Mr. Samuels is not emphasizing and is not discussing is that the only evidence that any of these actions were actually improper was a violation of regulations and policies. No criminal intent, no intent to deprive anyone of property. There's no one that could have been criminally prosecuted for this. Because this violation, Mr. Samuels makes much of the restrictive categories of funding. Those things are restrictions by policy and regulation at the state level, at the federal level. There was conflating testimony from government agency experts about whether it was in fact a violation. And that goes to Mr. Spirido's statements to federal regulators and state regulators and agency officials that could not have been false. Because he does not believe them to be false and never did at any time. He believed the actions he took were appropriate and in accordance with state law. That he took these actions and that he moved these funds properly, legitimately, with authority and with knowledge. There's no intent to conceal. These actions were public. They were shared with the members of the commission. There's ample testimony from government witnesses on those points. And so it involves all of the false statements. We do point to the fact that policy violations, particularly at the state level, were the predicates for some of the specific counts of conviction. It was particularly egregious and an abuse of discretion for the judge to exclude the pieces of evidence about a change in the state law that happened after Mr. Spirido moved those funds. And that he should have been permitted to put that evidence on. And then finally, Your Honor, I think in our brief we lay out the aggregate value of the vehicle transactions. That there is a temporal limitation in the statute that we would ask you to uphold. And that we ask those convictions to be reversed and dismissed. Thank you, Ms. Harrigan. Thank you as well, Mr. Samuels, for your fine arguments. Likewise, we can't come down and beat you, but please know nonetheless that we very much appreciate your arguments and helping us on these cases. Thank you very much. This honorable court will take a brief recess.
judges: Roger L. Gregory, Diana Gribbon Motz, Stephanie D. Thacker